IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 4, 2011 Session

# IN RE NOEL B.F.

## THE DEPARTMENT OF CHILDREN'S SERVICES
v.
## VEDA L.M.

**Appeal from the Juvenile Court of Davidson County**
**No. PT 121799    Carlton M. Lewis, Special Judge**

_____

**No. M2010-02343-COA-R3-PT - Filed August 16, 2011**

_____

This is a parental termination case.  The appellant mother has a history of serious mental illness and persistent difficulties in managing her mental illness, resulting in multiple hospitalizations and incarcerations.  The Tennessee Department of Children's Services took custody of the child immediately following her birth. After the guardian ad litem and the Department of Children's Services filed petitions to terminate the mother's parental rights, the child's aunt filed an intervening petition for termination of the mother's parental rights and for custody.  The trial court terminated the mother's parental rights and did not grant the aunt's intervening petition for custody.  The aunt did not appeal.  The mother appeals, arguing that the trial court's decision to allow the child to remain with the foster parents, instead of placing the child with the aunt was not in the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of Juvenile Court Affirmed.**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which  ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter and Joshua Davis Baker, Assistant Attorney General, for the Petitioner/Appellee, State of Tennessee, Department of Children's Services.

Sheryl Guinn, Nashville, Tennessee, for Respondent/Appellant, Veda L.M.

Stephen Mills, Nashville, Tennessee, Guardian Ad Litem.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Defendant/Appellant Veda L.M. ("Mother"), originally from Illinois, has a long history of severe mental illness. The onset of Mother's mental illness began in Illinois, when she was in her mid-twenties. As her mental condition worsened, between 2002 and 2005, Mother was hospitalized four times in Illinois. She was placed on medication to control her mental illness and qualified for disability benefits because of her mental illness.

Mother met Respondent Nathaniel J. F. ("Father") while both were in treatment for mental illness. In 2008, Mother and Father moved to Nashville, Tennessee; Father had previously lived in Tennessee. Mother and Father never married.

Upon relocating to Tennessee, Mother discovered that she was pregnant. Shortly after that, she stopped taking the medication that controlled her mental illness because she was fearful that the medication would harm her child. After that, Mother's mental condition deteriorated precipitously. In June 2009, when Mother was about 36 weeks into her pregnancy, family members became so alarmed at her behavior that she was involuntarily hospitalized. When police officers arrived to take Mother to the hospital, she was living alone in a dirty apartment. She became agitated and attempted to fight the police officers. She exhibited mania, dazed periods, "phase out" or losing track of her thoughts, and "word salad," that is, stringing together random words and phrases into a sentence that makes no sense.[1] Mother was diagnosed with bipolar I disorder, and severe manic episodes with psychotic features. She was prescribed medication to control her symptoms.

After that, Mother continued to experience difficulties. On July 14, 2009, Mother arrived at the hospital for the scheduled caesarian section birth of her baby. After exhibiting agitation, irritability, racing thoughts and paranoia, she was transferred to the psychiatric unit of the hospital. After Mother's daughter Noel was delivered, the Tennessee Department of Children's Services ("DCS") took the child into protective custody because Mother was incapable of caring for her. The child was found to be dependent and neglected and placed in foster care. A guardian ad litem was appointed.

---

[1]For example, Mother stated that the "Octomom" was trying to reproduce the birth based on her own personal vendetta.

Despite taking medication to control her mental illness, Mother continued to exhibit severe symptoms. She had delusions,[2] slowed psychomotor activity, continued symptoms of bipolar I disorder, could sleep for only two hours at a time, and engaged in suicidal gestures such as drinking household cleaning substances.

In September 2009, DCS entered into a permanency plan for Noel. Mother refused to sign the permanency plan, but DCS reviewed the plan with her. The plan required Mother to find permanent housing, have supervised visitation with Noel, develop a network of support, be mentally and financially able to provide for the child, attend all of the child's medical appointments, complete a mental health evaluation, comply with the resulting recommendations, and pay child support. Subsequently, the permanency plan was revised to require Mother to participate in domestic violence counseling and a mental health group.

In the ensuing months, Mother was at times noncompliant with her medication and continued to struggle with her mental illness. Her speech remained disorganized and tangential,[3] she was not sleeping and refused to eat, and she was at times psychotic and delusional,[4] or violent. During this time, she was intermittently involuntarily hospitalized or incarcerated for incidents arising from her mental illness.[5] There were also incidents of domestic violence with Father.

When she was not hospitalized or incarcerated, Mother's limited supervised visitation with infant daughter Noel was problematic. During visits, Mother at times appeared drowsy or would "phase out," and at other times she appeared agitated. She made inappropriate comments and randomly began singing. On two occasions, Mother almost dropped the baby while sitting with her on the floor. Mother had inappropriate expectations of the infant[6] and became frustrated when the child cried.

---

[2]It was reported that Mother stated that she believed that President Barack Obama and former President Bill Clinton would be coming to get her.

[3]"Tangential" speech means the speaker goes off on tangents.

[4]Mother was religiously preoccupied and had delusions that Oprah Winfrey was after her.

[5]In one incident, Mother broke her forearm when she attacked two female staffers for no apparent reason. In another incident, Mother was incarcerated after she said the word "bomb" in a federal building.

[6]Mother wanted the infant to say "mother" and "father" instead of "mama" or "dada." She would take the child's pacifier because she wanted the child to cry to make her vocal cords strong.

In February 2010, the guardian ad litem filed a petition in the Juvenile Court of Davidson County, Tennessee, to terminate the parental rights of both Mother and Father. In July 2010, DCS filed an intervening petition to terminate the parental rights of Mother and Father. Shortly after DCS filed its petition, Father surrendered his parental rights.

As grounds for termination of Mother's parental rights, the DCS petition alleged, *inter alia*, willful failure to support, conduct prior to incarceration that exhibited a wanton disregard for the welfare of the child, substantial non-compliance with the permanency plan, mental incompetence, and persistent conditions.

On August 19, 2010, Mother's sister, Monica V. M. ("Aunt"), filed an intervening petition, seeking to terminate Mother's parental rights and obtain custody of the child. In her petition, Aunt claimed that Mother consented to an award of custody of the child to Aunt.[7] In response, DCS sought dismissal of Aunt's petition on the grounds that Aunt lacked standing to file such a petition because she had not been caring for the child at issue, pursuant to T.C.A. § 36-1-113.

The trial court held a hearing on all of the pending petitions on the termination of Mother's parental rights, over the course of two days, August 31 and September 9, 2010. Father's parental rights were no longer at issue because he had surrendered his parental rights. As to Mother's parental rights, the trial court heard testimony from a variety of witnesses, including a psychologist who evaluated Mother, a social worker and psychotherapist who worked with Mother, the DCS case manager, a witness who supervised Mother's visitation with Noel, the child's foster mother, Mother, and finally Aunt.

The licensed psychologist, Dr. Janie Berryman ("Dr. Berryman"), testified that, at the request of DCS, she did an in-depth psychological evaluation of Mother by interviewing Mother, several DCS case workers, Mother's therapist from a mental health facility, observing Mother's interaction with Noel, and reviewing Mother's history of violent behavior, arrests, hospital admissions and frequent non-compliance with her medication regime. She diagnosed Mother as bipolar I, and noted the consistent reports of psychotic behavior and psychotic episodes with psychotic delusions. Dr. Berryman described Mother's periods of stability as "short-lived" because she was so frequently out of compliance with her medication. Dr. Berryman opined that Mother was not capable of caring for a child on her own.

---

[7]Aunt's petition states that "she refers to and incorporates herein each and every provision of Mother's Motion for Least Drastic Alternative filed on August 2, 2010." The record does not include a copy of this alleged motion.

The licensed clinical social worker and psychotherapist testified about Mother's limited ability to stay on her medication and the resulting hospitalizations and incarcerations.

The witness who facilitated the supervised visitation between Mother and Noel testified about Mother's many difficulties during her sporadic visitations with her child. Overall, the witness felt that Mother had made little progress over the course of her visits with her child, and that Mother was not capable of providing the child with a secure, safe environment. In contrast, the witness observed that the child had a bond with her foster parents, and that the foster parents took proper care of her.

The DCS case worker expressed her belief that it was in the child's best interest to remain with her foster family, and not be placed in Aunt's custody. She testified that Aunt had told her on two occasions that she had no interest in fostering or getting custody of the child. Moreover, Aunt stated in September 2009 that, because of Mother's lack of stability, the child should be adopted by non-relatives. On another occasion, Aunt said she would be unable to care for the child if something happened to Mother's mother. The DCS case worker noted that Aunt had visited the child only once in her entire life.

The child's foster mother also testified, noting at the outset that Noel had resided with her and her husband for fourteen months. She said that Noel was "doing wonderfully," and that they hope to adopt her. She also stated that Noel's visits with Mother had a detrimental effect on the child. After each visit, the foster mother said, "I have to sit up in the chair with her [Noel] before she can go to sleep. She has to place her hand on my face, and she has to make sure I'm not going anywhere."

Mother testified as well. Mother said that she had no car, was residing in a hotel with Father, and that their sole income was Mother's $1046 per month in disability benefits. Mother claimed that the hotel room was adequate housing for the child. Mother conceded that she was not in compliance with the permanency plan, but was critical of DCS's assistance to her and attributed her noncompliance in part to postpartum depression. Mother also conceded that she was arrested for several criminal offenses, including filing a false domestic violence report against Father and an incident of vandalism at a gas station.

In her testimony, Mother admitted that she was not ready to care for Noel. However, she expressed her desire that Noel be raised by Aunt, living in Chicago. Mother did not want the child to remain in state custody, but wanted the child to know her grandparents, cousins, and other family members. Mother said that Aunt was capable of caring for the child. Mother acknowledged that she did not cooperate when Aunt and her own mother came to Tennessee with the intention of bringing Noel back to Chicago with them, but explained that she was

suffering from postpartum depression at the time. Mother conceded, however, that the foster parents were taking good care of the child.

Finally, the trial court heard testimony from Aunt. Aunt said that she was employed by the City of Chicago as a licensed certified paramedic. Aunt testified that she sought custody of Noel because Mother was not able to raise her and said that she, Aunt, could give her a stable, loving home. Aunt claimed that her previous statement that she did not want Noel was the result of a misunderstanding with Mother and Father. She explained that her initial hesitation in seeking custody of the child also came from a concern that Noel had a communicable disease, and uncertainty about how such a disease would affect her other children at home. Once it was determined that Noel did not have a communicable disease, Aunt said, she changed her mind about seeking custody of Noel. Aunt testified that she is a trained foster parent and noted that she had recently adopted her two grandchildren as the result of a tragedy.

At the conclusion of Aunt's testimony, the trial court took the case under advisement. On September 24, 2010, the trial court entered its order terminating Mother's parental rights. It noted at the outset that the three termination petitions filed in the cause, by the guardian ad litem, DCS, and Aunt, were consolidated for hearing.[8] The trial court stated specifically that its order granted the termination petitions filed by the guardian ad litem and by DCS.

The trial court's order was comprehensive and included detailed findings of fact and conclusions of law as to each ground for termination of Mother's parental rights, and as to the best interest of the child.

Pursuant to T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), the trial court found that Mother had abandoned the child by willful failure to visit, willful failure to support, and by engaging in conduct prior to her incarceration that exhibited a wanton disregard for the welfare of the child. The trial court cited, *inter alia*, Mother's actions that caused her incarceration, such as threatening to "blow up" the jail facility where she was visiting Father, who was incarcerated for committing domestic assault on Mother.

The trial court also found that Mother had not substantially complied with her responsibilities under the permanency plan, pursuant to T.C.A. § 36-1-113(g)(2). The trial court made

---

[8]During the hearing, the trial court referred to having "dismissed" Aunt's intervening petition to terminate Mother's parental rights for lack of standing, while retaining the portion of Aunt's petition that sought custody of the child. The appellate record, under the auspices of then-Davidson County Juvenile Court Clerk Vic Lineweaver, includes no such order. Regardless, the trial court's final order made it clear that the trial court granted the petitions of the GAL and DCS, but not Aunt.

detailed findings on Mother's responsibilities under the plan, found that the requirements were reasonable, and set forth DCS's reasonable efforts to assist her in fulfilling her responsibilities. Despite DCS assistance, the trial court found, Mother failed to maintain appropriate housing, failed to develop a positive network of family, friends, and community partners to assist her in caring for the child, failed to follow the recommendations from her parenting assessment, failed to maintain consistent compliance with her therapy and medication management, and failed to follow the discharge instructions following her multiple involuntary admissions for mental health treatment.

Pursuant to T.C.A. § 36-1-113(g)(3), the trial court found that Noel had been removed from Mother's care more than six months, that the conditions that led to the child's removal still existed and were unlikely to be remedied at an early date, and that continuation of the parent/child relationship greatly diminished Noel's chances of integrating into a safe, stable, permanent home. The trial court found that the conditions that led to the removal of the child from Mother's custody were Mother's ongoing mental incompetence and mental instability, and her resulting inability to care for her child. Based on the trial testimony, the trial court detailed Mother's inability to care for the child, as demonstrated in her supervised visits.

Under T.C.A. § 36-1-113(g)(8), the trial court found that the evidence showed that Mother was mentally incompetent to care for the child. Outlining the detailed testimony on Dr. Berryman's evaluation and the many incidents of Mother's odd behavior, delusions, agitation, violent outbursts, paranoia, suicidal gestures, inability to maintain a medication regime, and recurrent hospitalizations, the trial court found that Mother was so mentally impaired that she was unable to care for her daughter.

Pursuant to T.C.A. § 36-1-113(i), the trial court found that termination of Mother's parental rights was in the best interest of the child. It found that Mother's continued mental instability and her unavailability due to frequent hospitalizations and incarcerations had resulted in no meaningful relationship between Mother and Noel. It also found that the child had developed a strong bond with her foster family, that she received good care from the foster family, and that the foster parents hoped to adopt Noel.

Overall, the trial court found clear and convincing evidence to support the grounds for termination of Mother's parental rights, and clear and convincing evidence that such termination was in the child's best interest. It ordered the termination of Mother's parental

rights and awarded custody and guardianship of the child to DCS, with the right to place the child for adoption and consent to such adoption.[9]  Mother now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

In this appeal, Mother does not dispute that grounds for termination of her parental rights were established.  Rather, she asserts that the trial court erred in not awarding custody of the child to Aunt, as a less drastic alternative to awarding custody to DCS or the State of Tennessee.  Aunt, it should be noted, does not appeal the trial court's decision.

Because of the profound consequences of a decision to terminate parental rights, courts apply a higher standard of proof.  Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. T.C.A. § 36-1-113(g)(8)(B) (2010); *In re Adoption of A.M.H.*, 215 S.W.3d 498, 808 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  This heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions.  *See In re M. W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).  Evidence that meets the clear and convincing standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted).  "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. (citations omitted); *see also In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).

In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007) (citations omitted).  When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's determinations as to the credibility of the witnesses.  *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999).  Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them.  TENN. R. APP. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91. (Tenn. 1993).  The appellate court then determines whether the combined weight of the facts,

---

[9]While the trial court's order did not explicitly deny Aunt's petition for custody, it indicated clearly that it had considered Aunt's petition and awarded custody to DCS, and thus implicitly denied Aunt's petition.

as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establishes all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B*., 228 S.W.3d at 156; *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law are reviewed *de novo* on the record, affording them no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993); *In Re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2436560, at *9 (Tenn. Ct. App. June 16, 2011); *In re Tiffany B.*, 228 S.W.3d at 156.

## ANALYSIS

### *Grounds for Termination*

On appeal, Mother admits that "the grounds for termination were proven and are not being disputed in this appeal." Nevertheless, because of the importance of the issues, this Court has reviewed in detail the evidence in the record and the trial court's extensive findings of fact and conclusions of law on each ground the trial court found to be established. After careful review of the trial court's thorough opinion, we find clear and convincing evidence in the record to support each ground for termination on which the trial court relies. Therefore, the trial court's decision on all grounds for termination is affirmed.

### *Best Interest*

Mother's sole argument on appeal is framed in terms of the best interest of the child. She argues that the award of custody to DCS does not achieve permanency for the child, but leaves her in foster care. Mother cites T.C.A. § 37-2-403(d) (2010) for the proposition that placing the child with a family member, namely Aunt, is the "least drastic alternative" to the custody of a parent, and is less drastic than leaving the child in State custody. Ultimately, Mother appears to argue that placement with Aunt is in the best interest of Noel, and family placement should be accorded weight as a factor in the trial court's best interest analysis, because the trial court is not limited to the factors listed in T.C.A. § 36-1-113(i).[10] She

---

[10] The statute provides as follows:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the

(continued...)

emphasizes Aunt's trial testimony that she wants to take custody of Mother's child, and is capable of caring for her.

In response, DCS argues that T.C.A. § 37-2-403 is inapplicable to the facts of this case, citing **In re S.B.**, No. M1999-00140-COA-R3-CV, 2000 WL 575934 at *4 (Tenn. Ct. App. May 12, 2010). DCS emphasizes the holding in **In re S.B.** that T.C.A. § 37-2-403 applies only to the time period immediately after the child is removed from the biological parents, and not is not applicable where, as here, "the child has been living in a foster home for an extended period of time." DCS also notes that, when Aunt was initially contacted by DCS regarding custody of the child, Aunt told DCS that she had no interest in serving as the

---

[10](...continued)

    parent or guardian;

    (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible;

    (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

    (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

    (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

    (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

    (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

    (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

    (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101

T.C.A. §36-1-113(i) (2010).

child's foster or custodial parent. Additionally, DCS cites *In the Matter of Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010) *perm. app. den'd.*, for its holding that "the failure to place a child with a relative is not grounds for reversing an order terminating a parent's parental rights."

Mother cites two statutes in support of her argument. Tennessee Code Annotated § 37-2-403(a)(1)(A) provides as follows:

> Within thirty (30) days of the date of foster care placement, an agency shall prepare a plan for each child in its foster care. Such plan shall include a goal for each child of:
>
> (i) Return of the child to parent;
> (ii) Permanent placement of the child with a fit and willing relative, or relatives of the child;
> (iii) Adoption, giving appropriate consideration to § 36-1-115(g) when applicable;
> (iv) Permanent guardianship; or
> (v) A planned permanent living arrangement.

T.C.A. § 37-2-403(a)(1)(A)(i-iv) (2010). T.C.A. § 37-2-403(d) (2010), also cited by Mother, states that "[w]henever a child is removed from such child's home and placed in [DCS] custody, the department shall seek to place the child with a fit and willing relative if such placement provides for the safety and is in the best interest of a child."

Parenthetically, we note that it is doubtful whether Mother has standing to directly appeal the trial court's award of custody to DCS rather than to Aunt. The relief granted against Mother was the termination of Mother's parental rights. The award of custody to DCS follows necessarily from the termination of her parental rights, but is not relief granted against Mother. Rather, the trial court awards custody to DCS after the parent's rights have been terminated, so at the point that custody is awarded to DCS, the parent no longer has a legally cognizable interest in the child.[11] Thus, parental termination cases in which the actual award of custody is appealed have generally involved a party-appellant who is not the biological parent, but who sought custody of the child in the event the biological parent's parental rights were terminated. *See, e.g., In re S.B.*, 2000 WL 575934, at *1.

---

[11]If the biological parent's parental rights are not terminated or the termination is reversed on appeal, the parent may not necessarily regain custody, but would then have a legally cognizable interest in the child.

In cases where the biological parent has questioned on appeal the trial court's award of custody after terminating the biological parent's rights, the parent's argument typically has been framed as part of the elements that must be proven to terminate parental rights. For example, this Court has considered several cases in which the biological parent argued that DCS's obligation to use "reasonable efforts" to assist the parent in regaining custody required DCS to place the child in the custody of a family member. *See In the Matter of Arteria H.*, 326 S.W.3d at 184; *In re Deashon A.C.*, No. E2009-01633-COA-R3-PT, 2010 WL 1241555, at *8 (Tenn. Ct. App. Mar. 31, 2010); *In re O.J.B.*, No. W2009-00782-COA-R3-PT, 2009 WL 3570901 at *9, (Tenn. Ct. App. Nov. 2, 2009); *In the Matter of K.L.D.R.*, No. M2008-00897-COA-R3-PT, 2009 WL 1138130 at *8 (Tenn. Ct. App. Apr. 27, 2009); *In re S.B.*, 2000 WL 575934 at *1.

In each of the cases cited above, the Court held that the issue of the placement of the child with a relative should have been raised in the dependency and neglect proceedings, rather than in termination proceedings, and that the failure to place the child with a family member is not a basis to defeat a petition to terminate parental rights. *See In the Matter of Arteria H.*, 326 S.W.3d at 184; *In re Deashon A.C.*, 2010 WL 1241555, at *8; *In re O.J.B.*, 2009 WL 3570901, at *9; *In the matter of K.L.D.R.*, 2009 WL 1138130, at *8. *See also In re J.D.L.*, No. M2009-00574-COA-R3-PT, 2009 WL 4407786, at *10 (Tenn. Ct. App. Dec. 2, 2009).

In this case, Mother does not argue that the failure to place Noel with Aunt after the child was taken into protective custody amounted to a failure by DCS to use "reasonable efforts." This is perhaps out of recognition that, after Noel was taken into protective custody, DCS spoke to Aunt about assuming custody of Noel, and Aunt told DCS representatives that she had no interest in taking custody of the child. In prior cases where it has been argued that DCS did not use reasonable efforts to place the child with a relative, this Court has observed that, "a parent cannot be heard to complain when a relative who initially inquires about custody then fails to take any further action, so that the relative's lack of consideration for placement was due to his or her own failure to act." *In re K.L.D.R.*, 2009 WL 1138130, at *16 (citing *In Re Jeremiah T.*, No. E2008-02099-COA-3-PT, 2009 WL 1162860 at *10 (Tenn. Ct. App. Apr. 30, 2009); *In re O.J.B.*, 2009 WL 3570901, at *9 (quoting *In re Jeremiah T.*, 2009 WL 1162860, at *10).

In the instant case, Mother's argument is posited in the context of the trial court's "best interest" analysis. Mother notes that, by the time of the termination hearing, Aunt had decided to seek custody of Noel, and Mother argues that Aunt was in a good position to take custody of the child. She argues that an appropriate relative placement is favored as a "less drastic alternative" to non-relative foster care under T.C.A. §§ 37-2-403(a)(1)(A) and 37-2-

403(d), quoted above, and comments that "the termination hearing is as good a time as any to bring a less drastic alternative before the court."

Mother's counsel cites no caselaw in support of this argument. Indeed, this Court has specifically held that the statutes on which Mother's counsel relies are not applicable in termination proceedings, and that by the time the court considers the termination of the biological parent's parental rights, it is in fact too late "to bring a less drastic alternative before the court," since the issue of relative placement is considered at the dependency and neglect stage of the proceedings, not the termination proceedings. *See, e.g., In re Deashon A.C.*, 2010 WL 1241555, at *8; *In the Matter of K.L.D.R.*, 2009 WL 1138130, at *8. While *In re S.B.*, discussed above, did not involve an appeal by a biological parent, its analysis of the statutes on which Mother relies is instructive. Discussing Section 37-2-403(a)(1), the *In re S.B.* Court stated: "The preference for placement with family, by the language of [T.C.A. §37-2-403(a)(1)], applies at the time [DCS] prepares the plan for the child." 2000 WL 575934, at *4. The appellate court noted that, by the time of the termination hearing, the child at issue had been in the foster parents' care for more than a year, "so that any preference for a goal of family placement shortly after the removal would have no application." *Id.* As to Section 37-2-403(d), also cited by Mother in this case, the *In re S.B.* Court found that it also applied immediately after removal from the parent's home, and further observed that there is nothing in that statute "to indicate that an ongoing placement with a non-relative that is otherwise serving the child's best interest must be ended if a family member later seeks to adopt the child." *Id.*

Thus, the statutes relied upon by Mother are neither applicable nor relevant in proceedings to terminate the parental rights of a biological parent, as to either grounds for termination or the best interest of the child. Apart from the applicability of the statutes, Mother's counsel fails to demonstrate how the issue of relative placement is relevant to the best interest analysis. In considering best interest, the focus of the court must be on whether complete severance of the child's relationship with the biological parent is in the best interest of the child.

Considering the best interest of the child at issue in this case, Noel, we find that the record contains ample evidence to support the trial court's finding on best interest. As Mother acknowledged, the evidence shows that she was in "no position" to care for the child. The evidence showed that even the sporadic visitation Mother had with Noel left the young child unsettled and insecure. As to Aunt, as in *In re S.B.*, no matter how virtuous and well-meaning Aunt may be, we do not see how it would be in Noel's best interest to end "an ongoing placement with a non-relative that is otherwise serving the child's best interest" in favor of an award of custody to a family member who only visited Noel on one occasion.

***In re S.B.***, 2000 WL 575934, at \*4. At the time of the termination hearing below, the child was in a loving, stable home with foster parents who wish to adopt her, and termination of Mother's parental rights paves the way for the child to be adopted into a permanent home. Thus, we find clear and convincing evidence to support the trial court's finding on best interest and the termination of Mother's parental rights.

## CONCLUSION

The judgment of the trial court is affirmed. Costs on appeal are assessed against Appellant Veda L.M., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE